1

2

3

4

5

6                    IN THE DISTRICT COURT OF GUAM

7

8   D.M.,                                    CIVIL CASE NO. 19-00030

9              Plaintiff,

10         vs.

11  ANTHONY SABLAN APURON;

12  HOLY SEE (State of the Vatican city), Its       **DECISION AND ORDER**
    Instrumentalities and/or Agents - Does 1-10;   Granting Holy See's Motion to Dismiss for
13                                                   Lack of Subject Matter Jurisdiction, Lack
    ROMAN CATHOLIC ARCHBISHOP OF                    of Personal Jurisdiction, and Insufficient Service
14  AGANA;                                          of Process (ECF No. 51)

15  CAPUCHIN FRANCISCANS; CAPUCHIN
    FRANCISCANS PROVINCE OF ST. MARY;
16  CAPUCHIN FRANCISCANS CUSTODY OF
    STAR OF THE SEA; and
17
    FATHER DUENAS MEMORIAL SCHOOL,
18
               Defendants.

19

20         This action arose from the alleged sexual abuse of a minor attending a Catholic high school

21  on Guam during the school year 1994-1995 by the then Archbishop of the Archdiocese of Guam,

22  Anthony Apuron.  Plaintiff D.M. brought suit against the Holy See, a foreign sovereign, among other

23  defendants.  The matter came before the court for hearing on Defendant Holy See's Motion to

24  Dismiss for Lack of Subject Matter Jurisdiction, Lack of Personal Jurisdiction, and Insufficient

25  Service of Process.  The Holy See sought dismissal of the action against it, arguing that the First

26  Amended Complaint (the "FAC") was defectively served upon it.  The Holy See also argued that

27  Plaintiff's claims must be dismissed under the Foreign Sovereign Immunities Act for lack of subject

28  matter jurisdiction and lack of personal jurisdiction.  Following the hearing, the court permitted the

parties to submit supplemental briefs.[1]  Having reviewed the parties' briefs and relevant authority, the court hereby grants the Holy See's motion as more fully discussed below.

## II.    ALLEGATIONS IN THE FAC

### A.    Allegations of child sexual abuse committed against Plaintiff

Plaintiff grew up in Saipan and attended Father Duenas Memorial School ("FDMS") in Guam during the 1994-1995 academic year.  *See* FAC at ¶¶20-21, ECF No. 1-1.  The Plaintiff was a 14-15 year old freshman at the time.  *Id*. at ¶25.  Because FDMS did not offer boarding on weekends, arrangements were made for him to stay with Apuron[2] in his personal residence on the weekends, and the Plaintiff returned to Saipan about one weekend each month.  *Id.* at ¶¶22-24.

During the first weekend at Apuron's home, the Plaintiff went to the downstairs bedroom assigned to him and fell asleep wearing a pajama top and shorts.  *Id*. at ¶¶27 and 29.  He was awakened by the sound of the bedroom door opening, and the Plaintiff saw Apuron slowly entering the room.  *Id.* at ¶29.  The Plaintiff pretended he was asleep.  *Id*. at ¶30.  Apuron quietly made his way to the Plaintiff's bed and began touching himself.  *Id*. at ¶31.  Apuron came closer, kneeled down on the floor at the middle of the Plaintiff's bed and moved his hand up and down the Plaintiff's thigh.  *Id*.  Apuron allegedly placed his hand under the Plaintiff's pajama shorts and fondled the Plaintiff's genitals.  *Id*. at ¶32.  Apuron did this for some time, breathing "as if he'd been running." *Id*.  Apuron then stopped, removed his hand quickly, and got up.  *Id*.  The Plaintiff cried for a couple hours before falling back asleep.  *Id*.

Apuron allegedly returned later that night or early morning, pinning the Plaintiff down and sodomizing him, with the Plaintiff yelling for Apuron to stop because the Plaintiff felt like the pain "would never stop."  *Id*. at ¶33.  This was just the first of many alleged sexual assault incidents that

---

[1]  *See* Order (Oct. 12, 2022) Granting Second Stipulation to Allow Supplemental Briefing, ECF No. 88; Holy See's Notice of New Authority re: *Blecher v. The Holy See*, ECF No. 84; and Plaintiff's Second Supplemental Brief, ECF No. 89.

[2]  The FAC asserts that Apuron was appointed as the Archbishop of the Roman Catholic Archdiocese of Agana by the Pope, in his role as the leader of the Holy See, and later removed from this position by the Pope.  FAC at ¶5, ECF No. 1-1.

1    occurred that school year. *Id*. at ¶35.

2         The Plaintiff "was alone, afraid and scared" and "felt like he had no one to talk to about what

3    Apuron had done." *Id*. at ¶36. Out of fear of Apuron and embarrassment, the Plaintiff could not tell

4    his family why he wanted to be away from Guam on the weekends. *Id*. at ¶37.

5         Because he was so traumatized by Apuron's alleged assaults, the Plaintiff claimed he was

6    "demonstrating signs that he was suffering from abuse" and the "faculty and staff of [FDMS] either

7    knew or should have known that [he] was suffering from abuse and either intentionally ignored what

8    was going on, or were negligent in their care and supervision" of the Plaintiff. *Id*. at ¶38.

9         At the end of the school year, the Plaintiff returned to Saipan and refused to return to FDMS.

10   *Id*. at ¶39. He convinced his parents to send him to a school in Hawaii, where he eventually

11   graduated. *Id*.

12        **B.    Allegations of child sexual abuse in the Catholic Church in the United States**

13        From 1981 to 1986, Reverend Thomas P. Doyle ("Rev. Doyle") was an employee and canon

14   lawyer for the Apostolic Nunciature, or embassy, for the Holy See in Washington, D.C. *Id*. at ¶13.

15   In 1985, Rev. Doyle and others wrote a 92-page report entitled "the Problem of Sexual Molestation

16   by Roman Catholic Clergy: Meeting the Problem in a Comprehensive and Responsible Manner" (the

17   "1985 Report"). *Id*. at ¶14. This report was released confidentially to United States bishops and also

18   shared with the Papal Nuncio to the United States, who traveled to the Holy See to discuss the report.

19   *Id*. at ¶¶14-15.

20        The FAC asserts that the 1985 Report "put the Holy See and United States bishops on notice

21   of 'sexual molestation of children by Clerics . . .' in the Catholic Church, and the need for immediate

22   action." *Id*. at ¶16. The 1985 Report noted that the "'circle of responsibility' for child sex abuse

23   extends to the Holy See and the 'Holy Father himself.'" *Id*. at ¶16.e. The report further warned that

24   "'it is imperative to clearly understand that transfer or removal [of an abusing priest] isolated from

25   any other action is far from adequate and could in fact lead to a presumption of irresponsibility or

26   even liability.'" *Id*. at ¶16.g (bracketed language in original). The 1985 Report also made specific

27   recommendations to address the issue but the "Holy See did not follow or institute the

28   recommendations of the 1985 Report." *Id*. at ¶¶16.h-j and 17.

1   The FAC asserts that there have been at least ten grand jury investigation reports issued in

2   the United States between 2002 and 2018 involving Roman Catholic clergy sexually abusing

3   children. *Id.* at ¶18. Additionally, in 2002, the Boston Globe issued an investigative report into

4   sexual abuse of children by clergy in the Boston Archdiocese, including an alleged cover up of sex

5   abuse by a cardinal. *Id.* at ¶19.

6        **C.    Alleged relationship between the defendants**

7   The FAC asserts that the Holy See has "unqualified and direct power over" the worldwide

8   Roman Catholic Church, *id.* at ¶6, and that it "acted through individuals, corporations, and

9   associations." *Id.* at ¶7. The Holy See is the "overarching parent organization" of the Archdiocese

10  of Agana,[3] the Capuchins[4] and FDMS.[5] *Id.* at ¶49. The FAC claims that the Archdiocese of Agana,

11  the Capuchins and FDMS "are not independent of or separate from the Holy See but are instead alter

12  ego entities of the Holy See."[6] *Id.*

13  According to the FAC, the Holy See operates on Guam as a business through the alter ego

14  entities, which are managed and operated by Doe Defendants 1-10 on behalf of and at the direction

15  of the Holy See. *Id.* at ¶53. Revenues generated from tuition charged by FDMS were allegedly sent

16  _____

17     [3] The FAC names the Roman Catholic Archbishop of Agana (hereinafter, the "Archdiocese

18  of Agana") as a defendant in this action. The FAC asserts that the Archdiocese of Agana is a "sole corporation plus a Guam non-profit corporation with its principal place of business in Mangilao,

19  Guam." FAC at ¶8, ECF No. 1-1. The Archdiocese of Agana supposedly is "an entity under the Holy See's control." *Id.*

20     [4] The caption of the FAC lists three "Capuchin-related" defendants: (1) Capuchin

21  Franciscans, (2) Capuchin Franciscans, Province of St. Mary and (3) Capuchin Franciscans Custody of Star of the Sea. FAC, ECF No. 1-1. The FAC collectively refers to the first two Capuchin

22  defendants (the Capuchin Franciscans and Capuchin Franciscans, Province of St. Mary) as the "Capuchins," "a religious order of priests serving various Catholic positions through the United

23  States, including Guam." FAC at ¶9, ECF No. 1-1. The Capuchin Franciscans, Province of St. Mary

24  allegedly "supervises the Vice-Province of Guam." *Id.* The FAC contains no allegation in its 113 paragraphs specifically against defendant Capuchin Franciscans Custody of Star of the Sea.

25

26     [5] Defendant FDMS is an all-male Catholic high school within the Archdiocese of Agana. *Id.* at ¶10.

27     [6] The FAC refers to the Archdiocese of Agana, the Capuchins and FDMS as the "alter ego

28  entities." *Id.* at ¶49.

1    directly or indirectly to the Holy See, thus benefitting the Holy See. *Id.* at ¶54.

2         Additionally, "[t]he Holy See holds power to control the alter ego entities, and the obligation

3    to protect those in its care[,] like the children . . .[,] from sexual abuse and assaults by the Holy See's

4    agents and employees." *Id.* at ¶61. The alter ego entities were the agents of the Holy See and were

5    motivated in part to further the purposes of the Holy See. *Id.*

6         The Holy See, through the Pope, appoints the bishop of the Archdiocese of Agana, and only

7    the Holy See, through the Pope, can suspend, remove, transfer or relieve the bishop of the

8    Archdiocese of Agana. *Id.* at ¶¶50-51. The Pope appointed and then later removed Archbishop

9    Apuron. *Id.* at ¶52. The FAC alleges Apuron sexually assaulted the Plaintiff and other children

10   while he was both an agent of the Holy See and an employee of the Holy See through the alter ego

11   entities. *Id.* at ¶¶55-57. The Holy See, through its agents, granted Apuron the authority to perform

12   as a Roman Catholic priest, and certified and held Apuron out to the community of the faithful as

13   a fit and competent agent of the Holy See. *Id.* at ¶62.

14        Apuron allegedly sexually assaulted the Plaintiff repeatedly while the Plaintiff was under

15   Apuron's authority, influence, and control. *Id.* at ¶63. The alleged sexual assaults on Plaintiff

16   "occurred while Apuron was acting in the scope of his employment, the agency relationship with the

17   Holy See and its alter ego entities and/or this conduct was committed within the apparent authority

18   arising from this employment and/or agency." *Id.* at ¶64.

19        The Holy See allegedly knew or should have known of the rampant sexual abuse of minors

20   on Guam by its employees, including Apuron. *Id.* at ¶65. The Holy See took no action to stop the

21   alleged abuses and instead ignored or covered those abuses up so that it could continue to enjoy the

22   revenue provided by the alter ego entities and Apuron. *Id.* at ¶66.

23        Apuron answered directly to the Pope in Rome when the allegations of Apuron's abuse of

24   children became public. *Id.* at ¶58. The Holy See allegedly only took action when Apuron's actions

25   "could no longer be hidden or denied." *Id.* at ¶59.

26        **D.    Filing of action and alleged theories of liability**

27        On August 8, 2018, the Plaintiff filed the original Complaint in the Superior Court of Guam.

28   ///

1    _See_ Compl., ECF No. 1-1 at 53-68.[7]  The FAC was filed on January 14, 2019, to add the "Holy See

2    (State of Vatican city), Its Instrumentalities and/or Agents – Does 1-10" as defendants.  _See_ FAC,

3    ECF No. 1-1 at 2-25.[8]  The FAC set forth the following causes of action:

|   | Cause of Action | Defendant(s) |
|---|---|---|
| 1 | Child Sexual Abuse | Apuron |
| 2 | Child Sexual Abuse (Vicarious Liability) | all defendants except Apuron |
| 3 | Negligence | all defendants |
| 4 | Negligent Supervision | all defendants except Apuron[9] |
| 5 | Negligent Hiring and Retention | all defendants except Apuron[10] |

        The first cause of action is brought against Apuron only for his alleged conduct as described

above. _Id._ at ¶¶67-73.

        The second cause of action is brought against all defendants except Apuron and asserts said

defendants "are vicariously liable . . . for Apuron's wrongful conduct under _Respondeat Superior_."

_Id._ at ¶¶75-76.  The Plaintiff asserts that the alleged sexual abuse by Apuron "arose from (and was

incidental to) Apuron's employment with the [Archdiocese of Agana]." _Id. at ¶78._  Said defendants

allegedly "ratified and approved Apuron's sexual abuse" by

        a.      failing to adequately investigate, discharge, and supervise him (and other
                Priests) known by Defendants [Archdiocese of Agana], [FDMS] and Does
                1-10 to have sexually abused children (or accused of the same);
        b.      concealing Apuron's sexual-abuse;

---

[7]  This reference refers to the page numbers in the CM/ECF-generated footer.

[8]  This reference refers to the page numbers in the CM/ECF-generated footer.

[9]  The heading of the fourth cause of action explicitly states that it is brought "Against All Defendants," but ¶104 states that "[t]his Fourth Cause of Action is pled against Defendants Holy See, Agana Archdiocese, Capuchins and [FDMS] for Negligence (collectively for this cause of action 'Defendants')."  FAC at ¶104, ECF No. 1-1.  Defendant Apuron is not a defendant in this fourth cause of action.

[10]  The heading of the fifth cause of action explicitly states that it is brought "Against All Defendants," but ¶110 states that "[t]his Fifth Cause of Action is pled against Defendants Holy See, Agana Archdiocese, Capuchins and [FDMS] for Negligence (collectively for this cause of action 'Defendants')."  FAC at ¶110, ECF No. 1-1.  Defendant Apuron is not a defendant in this claim.

1

      c.       failing to intervene to prevent ongoing and further sexual abuse;
      d.       failing to report the sexual abuse under 19 [G.C.A.] § 13201(b);

2

      e.       failing to institute adequate procedures to identify child sex abusers and to
                 prevent child sex abuse; and

3

      f.        allowing Apuron to continue in service as an Archbishop working for the []
                 Archdiocese [of Agana].

4

5

*Id.* at ¶77.a-f.

6

      The FAC alleges that "numerous similar incidents occurred before" so "Apuron's acts . . .

7

were foreseeable to Defendants." *Id.* at ¶80. The Plaintiff further asserts that "Defendants had actual

8

knowledge of Apuron's sexual abuse of D.M. . . . during his employment as a priest serving Father

9

Duenas, . . . as an agent and employee of the Agana Archdiocese, and while D.M. was a student at

10

Father Duenas." *Id.* at ¶83.

11

      In the third cause of action, the Plaintiff asserts that the Defendants had a duty to protect him

12

when he was entrusted to their care by his parents, *id.* at ¶88, and that the Defendants breached their

13

duty of care by

14

      a.       allowing Apuron to encounter D.M. without supervision;
      b.       failing to adequately supervise Apuron, which gave him access to D.M.;

15

      c.       negligently retaining Apuron, which gave him even further access to D.M.
                 (and others like him);

16

      d.       failing to investigate all adults allowed contact with children, including
                 Apuron;

17

      e.       failing to inform (and on information and belief knowingly conceal from)
                 D.M.'s parents and proper authorities under federal and state laws of

18

                 Apuron's sexual abuse of minors; and
      f.        negligently holding Apuron out as a trustworthy (and in good standing)

19

                 person of stature and integrity to D.M.'s parents, parishioners, and the
                 Guam community.

20

*Id.* at ¶96.

21

      The Plaintiff further alleges that Defendants Holy See, Archdiocese of Agana and FDMS

22

failed in their duties

23

      a.       to provide reasonable supervision of Apuron;
      b.       to provide reasonable supervision of D.M. on weekends when D.M.

24

                 stayed with Apuron;
      c.       to use reasonable care to investigate Apuron;

25

      d.       to use reasonable care to investigate and monitor D.M.'s living
                 circumstances at Apuron' s residence;

26

      e.       to provide adequate warning to D.M.'s family (plus other like
                 families with minors entrusted to Apuron) of Apuron's

27

                 sexually-abusive-and-exploitative propensities and unfitness that
                 were known to Defendants[] or should have been known to them;

28

      f.        to recognize the signs that D.M. was suffering from some abuse or

1          trauma while he attended classes and then to investigate and find
out what was happening to D.M.;

2        g.      to regulate time spent alone by employees with minors, and

       h.     to take reasonable measures to prevent future sexual abuse of

3          minors under their care, supervision, and trust.

4   *Id.* at ¶98.

5       The fourth cause of action asserts that Defendants Holy See, Archdiocese of Agana,

6   Capuchins and FDMS "knew or reasonably should have known of Apuron's sexually abusive and

7   exploitative propensities and/or that Apuron was an unfit agent," yet said Defendants "negligently

8   failed to supervise Apuron in his position of trust and authority as an archbishop where he was able

9   to commit the wrongful acts against D.M."  *Id.* at ¶106.  The FAC further alleges that said

10   Defendants "failed to provide reasonable supervision of Apuron, failed to use reasonable care in

11   investigating Apuron, and failed to provide adequate warning to D.M.'s family regarding Apuron's

12   sexually abusive and exploitative propensities and unfitness[, and] . . . further failed to take

13   reasonable measures to prevent future sexual abuse." *Id.*

14       Finally, the fifth cause of action alleges that Defendants Holy See, Archdiocese of Agana,

15   Capuchins and FDMS "had a duty not to hire, retain, or engage in the services of Apuron in light of

16   his sexually abusive and exploitative propensities."  *Id.* at ¶111.  The Plaintiff asserts that said

17   defendants

18        failed to properly evaluate Apuron in advance by failing to conduct necessary
       screening; failed to properly evaluate Apuron's conduct and performance as an

19        employee of, or provider of services to Defendants; and failed to exercise the due
       diligence incumbent upon employers to investigate employee misconduct, or to take

20        appropriate disciplinary action, including immediate termination and reporting and
       referral of Apuron's sexual abuse to appropriate authorities. [Said d]efendants

21        negligently continued to retain Apuron in service as an archbishop, working or
       providing services for Defendants, which enabled him to continue engaging in the

22        sexually abusive and predatory behavior described [in the FAC.]

23   *Id.* at ¶112.

24       On April 12, 2019, Defendant Archbishop of Agana removed the action to this court pursuant

25   to 28 U.S.C. §§ 1334 and 1452(a)[11] and pursuant to Federal Rules of Bankruptcy Procedure 9027(a).

26

27      [11]  Section 1452(a) provides:

28      A party may remove any claim or cause of action in a civil action other than a

1  *See* Notice of Removal, ECF No. 1.  An Amended Notice of Removal was filed on April 18, 2019,

2  to add defendants "Holy See, (State of the Vatican City), Its Instrumentalities and/or

3  Agents-Does1-10" as they had been named in the FAC.  *See* ECF No. 2.

4  **III.      DISCUSSION**

5        **A.      Whether the Holy See was properly served**

6              1.  Legal Standard

7        Federal courts cannot exercise personal jurisdiction over a defendant without proper service

8  of process.  *Omni Capital Int'l, Ltd. v. Wolff & Co.*, 484 U.S. 97, 104 (1987).  Insufficient service

9  can result in dismissal under Rule 12(b)(5).

10       Pursuant to Rule 4(j)(1), a "foreign state or its political subdivision, agency, or

11 instrumentality must be served in accordance with 28 U.S.C. § 1608."  Fed. R. Civ. P. 4(j)(1).

12       Under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), a foreign state is immune

13 from the jurisdiction of courts in the United States unless one of several enumerated exceptions to

14 immunity applies.  28 U.S.C. §§ 1604, 1605-1607.  If a suit falls within one of these exceptions, the

15 FSIA provides subject matter jurisdiction in federal district courts.  *See* 28 U.S.C. § 1330(a).  The

16 FSIA also provides for personal jurisdiction "where service has been made under section 1608[.]"

17 28 U.S.C. § 1330(b).

18             2.  Relevant Procedural Facts

19       Here, after the FAC was filed in the Superior Court of Guam, pursuant to 28 U.S.C.

20 § 1452(a), Defendant Archdiocese of Agana removed the action to this court on April 12, 2019.  *See*

21 Notice of Removal, ECF No. 1.  An Amended Notice of Removal was filed on April 18, 2019, to

22 add Defendants "Holy See, (State of the Vatican City), Its Instrumentalities and/or

23 ─────────────────────

24       proceeding before the United States Tax Court or a civil action by a governmental
         unit to enforce such governmental unit's police or regulatory power, to the district
25       court for the district where such civil action is pending, if such district court has
         jurisdiction of such claim or cause of action under section 1334 of this title.
26

27       Section 1334(b), in relevant part, provides that "district courts shall have original but not
   exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases
28 under title 11."  28 U.S.C. § 1334(b).

1  Agents-Does1-10" as they had been named in the FAC. *See* ECF No. 2.

2          On April 17, 2020, the Plaintiff filed a Motion for Letters Rogatory, seeking the assistance

3  of the court "to request international judicial assistance (letters rogatory) for service of process in

4  his suit against . . . the Holy See (State of Vatican City)." Pl.'s Mem. P. & A. Supp. Mot. Letters

5  Rogatory at 2, ECF No. 15-1. Citing to civil rule 4(f)(2)(B) and 28 U.S.C. §1608(a)(3), the Plaintiff

6  stated that the

7          request from the [c]ourt for international judicial assistance (letters rogatory) will
           allow effect of service on the Holy See as to the Summons in a Civil Action,
8          Complaint, and Certified Translations on the Holy See as prescribed by the Holy
           See's Law for service in an action in the Holy See's court(s) of general jurisdiction.
9

10  *Id.* at 5.

11          On May 20, 2020, the court granted the Plaintiff's Motion for Letters Rogatory. *See* Order,

12  ECF No. 16. The Letters Rogatory prepared by the Plaintiff and signed by the court were directed

13  "to the appropriate judicial authority of the Holy See (State of Vatican City)" and requested

14  "international assistance (letter rogatory) to effect service of process." Letters Rogatory at 1, ECF

15  No. 16-1.

16          On June 16, 2020, the Clerk's Office mailed, via DHL courier service, a copy of (1) the

17  Letters Rogatory, (2) the FAC, (3) a Summons, and (4) the Amended Notice of Removal, along with

18  Latin and Italian translations of said documents addressed to "Holy See (State of Vatican city)." *See*

19  Decl. of Mailing, ECF No. 19.

20          On July 22, 2020, the Clerk's Office was notified by DHL that the package addressed to the

21  Holy See was refused delivery. *See* ECF No. 20.

22          On December 30, 2020, the Clerk's Office transmitted service documents[12] to the U.S.

23  _____

24      [12] These documents included a two-page letter to the State Department and the following
    enclosures:
25      1.    Two copies of the First Amended Complaint (English)
        2.    Two copies of the First Amended Complaint (Italian)
26      3.    Two copies of the First Amended Complaint (Latin)
        4.    Two copies of the Amended Summons (English)
27      5.    Two copies of the Amended Summons (Italian)
        6.    Two copies of the Amended Summons (Latin)
28

1  Department of State for service via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). *See*

2  Certificate of Service, ECF No. 29.

3        On April 7, 2021, the State Department informed the Clerk's Office that service of the

4  documents were transmitted to the Holy See via diplomatic channels on March 18, 2021. *See* U.S.

5  Department of State Letter, ECF No. 34.[13]

6          3.  Whether service was proper under Section 1608(a)(3)

7        The first issue raised by the Holy See is that the Plaintiff failed to comply with the FSIA's

8  stringent service requirements.

9        Section 1608 governs service of process under the FSIA.  Section 1608(a) governs service

10  of process upon "a foreign state or political subdivision of a foreign state," while Section 1608(b)

11  applies for service upon "an agency or instrumentality of a foreign state."  28 U.S.C. § 1608(a) and

12  (b).  The parties are in agreement that service under Section 1608(a) applies here.

13        Section 1608(a) sets out four methods by which service on a foreign state "shall be made."

14  The first two methods are not relevant to the issue presented in the motion because there is no

15  "special arrangement for service" between the United States and the Holy See and because the Holy

16  See is not a party to any "international convention on service of judicial documents."  28 U.S.C.

17  § 1608(a)(1) and (2).  The remaining two methods of service under the statute are as follows:

18  ///

19

20         7.    Two copies of the Amended Notice of Removal (English)

21         8.    Two copies of the Amended Notice of Removal (Italian)
       9.    Two copies of the Amended Notice of Removal (Latin)

22       10.    Two copies of the Notice of Suit (attached to each of which is a copy of the Foreign

23             Sovereign Immunities Act) (English)

24       11.    Two copies of the Notice of Suit (attached to each of which is a copy of the Foreign
           Sovereign Immunities Act) (Italian)

25       12.    Two copies of the Notice of Suit (attached to each of which is a copy of the Foreign
           Sovereign Immunities Act) (Latin) [and]

26       13.    Cashier's check in the amount of $2,275.00 payable to the "U.S. Department of State."

27  Certificate of Service at 2, ECF No. 29.

28      [13] The letter was received and docketed on April 19, 2021. *Id.*

(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit,[14] together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, *to be addressed* and dispatched by the clerk of the court *to the head of the ministry of foreign affairs of the foreign state concerned*, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services – and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(b)(3) and (4) (emphasis added).

Here, the Holy See argues that the Plaintiff's first attempt at service through Letters Rogatory was deficient because it was not addressed to the head of the ministry of foreign affairs of the Holy See nor was a notice of suit sent with the Letters Rogatory as required by Section 1608(a)(3).

The Plaintiff essentially concedes that this first attempt at service did not strictly comply with Section 1608(a)(3), but the Plaintiff asserts that service of process was "substantially sufficient"as permitted under Ninth Circuit precedent. *See* Pl.'s Opp'n at 2-7, ECF No. 64. Plaintiff cites to the cases of *Straub v. A P Green, Inc.*, 38 F.3d 448 (9th Cir.1994), and *Peterson v. Islamic Republic of Iran,* 627 F.3d 1117 (9th Cir. 2010), for support of his claim that substantial compliance with the FSIA requirements is sufficient to effect service on a foreign state. The Holy See refutes this assertion and contends that the Supreme Court's decision in *Republic of Sudan v. Harrison*, ___ U.S. ___, 139 S. Ct. 1048 (2019) requires strict compliance with the service requirements under Section 1608(a).

In *Straub*, the plaintiff brought suit against Atlas Turner, an instrumentality of a foreign state. 38 F.3d at 451. The plaintiff mailed a copy of the summons and complaint by registered mail, return receipt requested to the defendant in Montreal, Quebec, Canada, and the mail receipt was signed and returned to the plaintiff. *Id.* at 450. The defendant did not respond to the suit, and default judgment

---

[14]  The statute defines"notice of suit" to mean "a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation."  28 U.S.C. § 1608(a).

1    was entered against it. *Id.* The defendant then moved to set aside the judgment for lack of

2    jurisdiction, but the district court denied the motion, and appeal followed. *Id.* On appeal, the Ninth

3    Circuit analyzed whether plaintiff had complied with the service requirements of Section 1608(b)(2).

4    Based on the plain language of the statute, the Ninth Circuit held that "the first clause of §

5    1608(b)(2) only authorizes service of process in the United States." *Id.* at 452. Since the documents

6    had been sent to Canada, the Ninth Circuit found that the plaintiff did not serve an authorized agent

7    in the United States, and thus service of process was not effective under Section 1608(b)(2). *Id.*

8    at 452-53. The Ninth Circuit also found that the plaintiff had not strictly complied with

9    Section 1608(b)(3),[15] because the complaint was not dispatched by the clerk of court. *Id.* at 453.

10   Nevertheless, the Ninth Circuit held that it was "formally adopt[ing] a substantial compliance test

11   for the FSIA." *Id.* The Ninth Circuit stated that the substantial compliance test is satisfied if the

12   defendant received actual notice of the lawsuit, and remanded the matter to the district court for

13   consideration of said issue. *Id.* at 453-54.

14           In *Peterson*, the plaintiffs obtained a default judgment against Iran in the District of

15   Columbia and thereafter registered their multi-billion dollar judgment in the District Court for the

16   Northern District of California. 627 F.3d at 1122. Plaintiffs then moved the court to order Iran to

17   assign to the plaintiffs as judgment creditors Iran's rights to payment from various shipping

18   companies that allegedly owed payment to Iran. *Id.* Though Iran did not appear to assert a sovereign

---

20       [15] Section 1608(b)(3) provides:

22       (3)   if service cannot be made under paragraphs (1) or (2), *and if reasonably
         calculated to give actual notice*, by delivery of a copy of the summons and complaint,
23       together with a translation of each into the official language of the foreign state –

24               (A)  as directed by an authority of the foreign state or political subdivision in
                 response to a letter rogatory or request or

25               (B)  by any form of mail requiring a signed receipt, to be addressed and
                 dispatched by the clerk of the court to the agency or instrumentality to be
26               served, or

27               (C)  as directed by order of the court consistent with the law of the place
                 where service is to be made.

28   28 U.S.C. § 1608(b)(3) (emphasis added).

immunity defense to the assignment, the trial judge raised the issue of immunity *sua sponte* and ultimately denied the assignment of the property rights to the plaintiffs. *Id.* The plaintiffs appealed. On appeal, the shipping company and the United States[16] asserted that the plaintiffs had not properly served the default judgment on Iran as required under the FSIA.[17] *Id.* at 1129. In discussing the service requirement under Section 1608(a)(3), the Ninth Circuit noted that counsel for the plaintiffs had mailed copies of the default judgment, the memorandum opinion and Farsi translations to the Iranian Foreign Minister by DHL Express. *Id.* While the Ninth Circuit acknowledged that the "plaintiffs' counsel erred by mailing a copy of the default judgment to the Iranian Foreign Affairs Minister himself, rather than asking the clerk of the court to mail the papers[,]" the "mistake [was] not fatal." *Id.* The Ninth Circuit noted that the *Straub* court had "adopted a substantial compliance test for the FSIA's notice requirements; a plaintiff's failure to properly serve a foreign state defendant will not result in dismissal if the plaintiff substantially complied with the FSIA's notice requirements and the defendant had actual notice."[18] *Id.* The Ninth Circuit found that the plaintiffs had substantially complied with the FSIA's service requirements. *Id.*

The Holy See asserts that the Ninth Circuit's substantial compliance standard does not survive the Supreme's Court's *Harrison* decision in 2019. The *Harrison* case stemmed from a suit brought by victims of the USS Cole bombing and their family members against the Republic of Sudan. 139 S. Ct. at 1054. Because services could not be made under Section 1608(a)(1) or (a)(2), at the plaintiffs' "request, the clerk of the court sent the service packet, return receipt requested, to: 'Republic of Sudan, Deng Alor Koul, Minister of Foreign Affairs, Embassy of the Republic of Sudan, 2210 Massachusetts Avenue NW, Washington, DC 20008.'" *Id.* Sudan failed to appear, and

---

[16] The United States filed an amicus curiae brief on appeal.

[17] Pursuant to the FSIA, "[a] A copy of any . . . default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section." 28 U.S.C. § 1608(e). Because Iran was a foreign state, the plaintiffs had to comply with the service requirements of Section 1608(a).

[18] The Holy See notes that the *Peterson* decision failed to discuss precedents from other circuits nor did it acknowledge that the *Straub* decision analyzed service under Section 1608(b) not Section 1608(a). Holy See's Mem. P. & A. Supp. Mot. Dismiss at 6-7, ECF No. 52.

default judgment was thereafter entered against it. *Id.* at 1055. "Again at [plaintiffs'] request, the clerk of the court mailed a copy of the default judgment in the same manner that the clerk had previously used." *Id.* The plaintiffs registered their default judgment in the District Court for the Southern District of New York and sought to satisfy the judgment through orders requiring several banks to turn over Sudanese assets. *Id.* After a sufficient time had passed, the court then issued three turnover orders. *Id.* Sudan then made an appearance for the purpose of contesting jurisdiction. *Id.* On appeal, Sudan asserted that "Section 1608(a)(3) required that the service packet be sent to foreign minister at his principal office in Khartoum, the capital of Sudan, and not to the Sudanese Embassy in the United States." *Id.* The Second Circuit Court of Appeals rejected this argument and concluded that "the method chosen by plaintiffs – a mailing addressed to the minister of foreign affairs at the embassy – was consistent with the language of the statute and could reasonably be expected to result in delivery to the intended person." *Id.* (quoting 802 F.3d 399, 404 (2nd Cir. 2015)). The Second Circuit's decision conflicted with a similar case arising in the Fourth Circuit, so the Supreme Court granted certiorari to resolve the conflict. *Id.*

In reading the plain language of Section 1608(a)(3), the Supreme Court ultimately held that Section 1608(a)(3) required "that the service packet must bear the foreign minister's name and customary address" which "is the place he or she generally works, not a farflung outpost that the minister may at most occasionally visit." *Id.* at 1057. In support of its holding, the Supreme Court analyzed other provisions of the FSIA. It compared Section 1608(a)(3), with 1608(b)(3)(B), which, unlike Section 1608(a)(3), contained "prefatory language saying that service by this method is permissible 'if reasonably calculated to give actual notice.'" *Id.* at 1058. On appeal, the plaintiffs argued that Section 1608(a)(3) embodied a similar requirement, but the Supreme Court rejected the plaintiffs' assertion that actual notice is sufficient under 1608(a)(3). *Id.* The Supreme Court stated that reading such a requirement into Section 1608(a)(3) "runs up against . . . well-settled principles of statutory interpretation." *Id.* The Supreme Court further stated that

> there are circumstances in which the rule of law demands adherence to strict requirements even when the equities of a particular case may seem to point in the opposite direction. The service rules set out in § 1608(a)(3), which apply to a category of cases with sensitive diplomatic implications, clearly fall into this category.

1    *Id.* at 1062.

2        The Supreme Court's more recent *Harrison* decision and its statement that the service rules

3    of Section 1608(a)(3) demand "adherence to strict requirements" undercut the theory and reasoning

4    underlying the Ninth Circuit's substantial compliance standard.  This court must determine whether

5    the Plaintiff strictly complied with the requirements of service under Section 1608(a)(3).

6        Here, the Plaintiff did not so comply.  Section 1608(a)(3) requires that the service packet, be

7    "addressed . . . to the head of the ministry of foreign affairs of the foreign state concerned."  Here,

8    the Letters Rogatory prepared by the Plaintiff and sent by the Clerk's Office were directed "to the

9    appropriate judicial authority of the Holy See (State of Vatican City)," not to the head of the ministry

10   of foreign affairs for the Holy See.  Additionally, the service packet did not include a notice of suit.

11   Accordingly, the court finds that the Plaintiff did not strictly comply with the requirements of

12   Section 1608(a)(3).

13                    4.   Whether service was proper under Section 1608(a)(4)

14       While the first attempt at service via Letters Rogatory may have been deficient under a strict

15   reading of Section 1608(a)(3), the Plaintiff nonetheless asserts that service was proper under Section

16   1608(a)(4).  Pl.'s Opp'n at 8-9, ECF No. 64.  The Plaintiff contends that his attempted service under

17   Section 1608(a)(3) could not be made within 30 days, and so a second attempt at service pursuant

18   to Section 1608(a)(4) was undertaken, and said service substantially complied with the statute's

19   requirements and applicable regulations.

20       The Holy See disagrees and asserts that because the Section 1608(a)'s service provisions are

21   "hierarchical, valid service must be attempted under [S]ection 1608(a)(3) before moving on to

22   service under [S]ection 1608(a)(4)."  Holy See's Mem. P. & A. Supp. Mot. Dismiss at 9, ECF

23   No. 52.

24       The court concurs with the Holy See's analysis.  Section 1608(a) prescribes the exclusive

25   means of service on foreign states, and its provisions are mandatory and specified in descending

26   order of preference.  Based on the plain language of the statute, a plaintiff may only resort to service

27   under Section 1608(a)(4) "if service cannot be made within 30 days under paragraph (3)."  28 U.S.C.

28   § 1608(b)(4).  The Supreme Court stated that Section 1608(a) "sets out in hierarchical order" the

1    methods of service on a foreign state.  *Harrison*, 139 S. Ct. at 1054.  Even the Ninth Circuit has

2    acknowledged that "[t]he four forms of service are listed in descending order of preference."

3    *Peterson*, 627 F.3d at 1129, n.4.  Thus, the Plaintiff cannot attempt service under Section 1608(a)(4)

4    until he first complies with the service requirements of Section 1608(a)(3) and such service fails or

5    cannot be made within 30 days.

6            Furthermore, the Holy See also asserts that the Plaintiff's Notice of Suit included in the

7    service packet sent through the State Department did not strictly comply with the requirements of

8    22 C.F.R. § 93.2(c).

9            As discussed in footnote 14 *supra*, a notice of suit must be "addressed to a foreign state and

10   in a form prescribed by the Secretary of State by regulation."  28 U.S.C. § 1608(a).  Title 22 of the

11   Code of Federal Regulations, Section 93.2 provides a Notice of Suit form and states that

12           [i]n supplying the information specified in item 5, a party shall in **simplified
             language** summarize the nature and purpose of the proceeding (including **principal
13           allegations** and claimed bases of liability), the reasons why the foreign state or
             political subdivision has been named as a party in the proceeding, and the nature and
14           **amount of relief sought**. The purpose of item 5 is to enable foreign officials
             unfamiliar with American legal documents to ascertain the above information.
15

16   22 C.F.R. § 93.2(c) (emphasis added).

17           The Holy See asserts that the Plaintiff's Notice of Suit, specifically item 5, was deficient on

18   two grounds.  First, it contends that the Notice of Suit did not set forth the "amount of relief sought"

19   as required by Section 93.2(c).  Here, the Notice of Suit served states that the Plaintiff's claims are

20   for "actual damages, exemplary damages, punitive damages, attorney's fees and costs, and other

21   relief, in an amount to be determined."  *See* Notice of Suit at 3, ECF No. 29-10.  While Plaintiff

22   cannot be expected to identify his damages precisely at this early stage of the litigation, "it would

23   be reasonable to expect a plaintiff suing a foreign state to identify at least a floor."  *Keenan v. Holy*

24   *See*, 521 F. Supp.3d 825, 830 (D. Minn. 2021).  Second, the Holy See asserts that item 5 of the

25   Plaintiff's Notice of Suit failed to summarize the lawsuit's "principal allegations" against it, as

26   required by Section 93.2(c).  The court has reviewed item 5 and notes that it does set forth the causes

27   of action against the Holy See and summarizes the claimed bases of liability, however, it does not

28   set forth any principal *factual* allegations that are otherwise contained in the FAC.  In light of these

1   two deficiencies, the court finds that the Notice of Suit does not strictly comply with 22 C.F.R.

2   § 93.2(c) and Section 1608(a).

3          Because service of process was deficient under Section 1608(a)(3) and (a)(4), the court lacks

4   personal jurisdiction over the Holy See. While the court recognizes the Plaintiff's earnest attempts

5   to serve the Holy See, the court must quash the purported service on the Holy See.[19] While the court

6   does not have personal jurisdiction over the Holy See until proper service by the Plaintiff has been

7   made, it would be inefficient to not address the remaining arguments raised in the Holy See's

8   motion, which the court discusses below.

9          **B.  Whether the court has subject matter jurisdiction under FSIA**

10         Under the FSIA, foreign states and governments, including their political subdivisions,

11  agencies, and instrumentalities, are immune from suit unless one of the statute's specific exceptions

12  applies. 28 U.S.C. § 1604. If the claim does not fall within one of the enumerated exceptions in

13  Sections 1605-1607, then the defendant is entitled to immunity and the courts lack both subject

14  matter and personal jurisdiction. Where an exception does apply, so that the defendant lacks

15  immunity and jurisdiction exists, the statute continues to govern the proceedings, and the FSIA

16  provides these foreign entities with certain protections and benefits, such as extended time for

17  answering complaints, a right of removal from state to federal court, entitlement to a non-jury trial

18  and limitations on award of punitive damages.

19         The Holy See asserts that none of the FSIA exemptions are applicable to confer jurisdiction

20  on this court.

21         1.  <u>Legal Standard</u>

22         The Holy See makes a facial attack on this court's subject matter jurisdiction. Holy See's

23  Mem. P. & A. Supp. Mot. Dismiss at 1, ECF No. 52. The court therefore "assume[s] [Plaintiff's]

24  [factual] allegations to be true and draw[s] all reasonable inferences in his favor." *Wolfe v.*

---

[19]   If the court found there was insufficient service of process, the Plaintiff asked for
permission to attempt service on the Holy See in compliance with applicable laws and regulation
within 90 days of the court's ruling. As for fully discussed *infra*, another attempt at service would
be futile because the court finds that the Plaintiff's claims must be dismissed against the Holy See
under FSIA.

*Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The court, however, need not accept the "truth of legal conclusions merely because they are cast in the form of factual allegations." *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009) (quoting *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003)) (emphasis removed). In evaluating assertions of subject matter jurisdiction based on an exception to foreign sovereign immunity, the court applies the same notice pleading requirements normally applied to any other assertion of subject matter jurisdiction and looks only for a "short and plain statement" of the basis for jurisdiction. *Doe*, 557 F.3d at 1074.

Since it is uncontested that the Holy See is a foreign state, "the burden of production shifts to the plaintiff to offer evidence that an exception applies. If the plaintiff satisfies [his] burden of production, jurisdiction exists unless the defendant demonstrates by a preponderance of the evidence that the claimed exception does not apply." *Peterson*, 627 F.3d at 1125 (quotation marks and internal citations omitted).

### 2.  *Bancec* presumption of entity separateness for jurisdictional purposes

Before addressing whether any of the FSIA's immunity exceptions apply in this case, the court must first determine which allegations in the FAC are attributable to the Holy See for purposes of establishing jurisdiction. *See Doe,* 557 F.3d at 1076. Here, the Plaintiff is suing the Holy See for its own alleged negligence as well as the tortious acts by Apuron, the Archdiocese of Agana, the Capuchins and FDMS, all alleged to be "agents" and/or employees of the Holy See. The Holy See argues that the court may not consider the alleged acts or omissions of the Archdiocese of Agana, the Capuchins and FDMS for jurisdictional purposes because the Plaintiff has not alleged facts that would overcome the presumption of separate juridical status such that the acts of said entities could be attributed to the Holy See.

In support of such assertion, the Holy See relies on the Supreme Court case of *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611 (1983).[20] In *Bancec*,

---

[20] In *Rubin v. Islamic Republic of Iran*, the Supreme Court stated that Congress amended the FSIA in 2008 to add Section 1610(g) and that such amendment "serve[d] to abrogate *Bancec with respect to the liability of agencies and instrumentalities of a foreign state where a § 1605A judgment holder seeks to satisfy a judgment held against the foreign state.*" *Rubin*, ___ U.S. ___, 138 S. Ct.

1    the Supreme Court recognized that instrumentalities of a foreign state are presumed to have separate

2    juridical statuses. *Id.* at 624-628. The Court explained that this presumption can only be overcome

3    when (1) "a corporate entity is so extensively controlled by its owner that a relationship of principal

4    and agent is created," or (2) when recognizing the separate status of a corporation "would work fraud

5    or injustice."[21] *Id.* at 629.

6            Similarly, here the court must begin with the presumption that the Archdiocese of Agana, the

7    Capuchins and FDMS are presumed to have separate juridical statuses from the Holy See. The court

8    must determine whether the allegations in the FAC have overcome this presumption by showing

9    either or of the two equitable prongs discussed above. The Ninth Circuit's *Doe v. Holy See* case is

10   helpful to this determination.

11           In *Doe*, a parishioner brought suit against the Holy See, an archdiocese, a Catholic bishop

12   and an order of Friar servants, alleging that when he was a minor he was sexually abused by a priest

13   in the archdiocese and a member of the order. 557 F.3d at 1069. The complaint alleged that the

14   archdiocese, the order and the bishop were corporations created by the Holy See. *Id.* at 1076. The

15   _____

16   816, 823 (2018) (emphases added). Because Section 1610(g) is not applicable to the facts of this

17   case, the *Bancec* standard is still applicable to the court's analysis here.

18           [21] In *Bancec*, a state-owned Cuban bank (Bancec) brought suit against an American bank to
     recover an unpaid letter of credit. 462 U.S. at 613. The Cuban government seized and nationalized

19   all of the American bank's assets in Cuba. *Id.* Bancec brought suit on the letter of credit in the
     Southern District of New York and the American bank counterclaimed, "asserting a right to set off

20   the value of its seized Cuban assets." *Id.* In the meantime, Cuba dissolved Bancec and transferred
     its claim to the Ministry of Foreign Trade of Cuba. *Id.* at 615-16. The Supreme Court had to decide

21   whether Bancec could be held liable for the act of expropriation committed by the Cuban
     government. *Id.* at 617. The Supreme Court recognized a presumption of "separate juridical

22   [status]" for the instrumentalities of foreign states, *id.* at 624-28, but also found that recognizing the
     separate status of Bancec "would work a fraud or injustice." *Id.* at 630-32. The Supreme Court

23   noted that the Cuban government could not have sued in its own name in a U.S. court "without
     waiving its sovereign immunity and answering for [its] seizure of [the American bank's] assets."

24   *Id.* at 633. Instead, Cuba transferred its assets to separate entities, and Bancec then sought to avoid
     liability for the seizure. *Id.* at 631-32. Given such circumstance, the Supreme Court concluded that

25   to "adhere blindly to the corporate form" would work such an "injustice" that the presumption of
     separate juridical status had been overcome. *Id.* at 632. The Court held Bancec liable for the Cuban

26   government's actions and permitted the American bank to offset the value of its seized assets from
     the amount it owed to Bancec. *Id.* at 634.

27

28

1   plaintiff alleged that the Holy See was vicariously liable for the priest's abuse of the plaintiff and for

2   the negligent actions of the archdiocese, the order and the bishop, in addition to being negligent itself

3   in its retention and supervision of the priest and in failing to warn of the priest's propensities. *Id.*

4   at 1071. Applying the *Bancec* presumption, the Ninth Circuit concluded that the plaintiff "ha[d] not

5   alleged sufficient facts to overcome the 'presumption of separate juridical status.'" *Id.* at 1079.

6   Although the complaint had alleged that the Holy See "created the dioceses and archdiocese" and

7   also gave "final approval as to the creation . . . of provinces of religious orders" in addition to

8   promulgating and enforcing "laws and regulations regarding . . . standards of conduct and discipline

9   for its members," the Ninth Circuit stated that said allegations were insufficient and did "not allege

10  day-to-day routine involvement of the Holy See in the affairs of" the archdiocese, the order and the

11  bishop. *Id.*

12          Additionally, the complaint directly alleged that the corporations were "agents" of the Holy

13  See. The Ninth Circuit stated that the term "agent"

> can have more than one legal meaning: the standard for determining that a natural
> person is the agent of another differs from the standard for attribution of the actions
> of a corporation to another entity. The *Bancec* standard is in fact most similar to the
> "alter ego" or "piercing the corporate veil" standards applied in many state courts to
> determine whether the actions of a corporation are attributable to its owners. Even
> reading the complaint generously to Doe, as we must, we cannot infer from the use
> of the word "agent" that Doe is alleging the type of day-to-day control that *Bancec*
> . . . require[s] to overcome the presumption of separate juridical status.

19  *Doe*, 557 F.3d at 1080 (internal citations omitted).

20          The Ninth Circuit also analyzed the second equitable prong of *Bancec* and found that the

21  plaintiff had "not alleged that the Holy See has inappropriately used the separate status of the

22  corporations to its own benefit . . . or that the Holy See created the corporations for the purpose of

23  evading liability for its own wrongs." *Id.* at 1080. The court stated that the Plaintiff's "vicarious

24  liability claim for the actions of the [a]rchdiocese, . . . [b]ishop, and [o]rder is based entirely on an

25  allegation that the actions of the domestic corporations are attributable to the Holy See" and that the

26  alleged tortious acts of these affiliated corporations should not be attributed to the Holy See. *Id.*

27          Here, the Plaintiff argues that *Bancec's* agency prong applies and overcomes the presumption

28  of separate juridical statuses. Instead of addressing *Doe*'s focus on the foreign sovereign's day-to-

day control over the other entities, however, the Plaintiff urges the court to apply the five factors set forth in Section 1610(g)(1)[22] to assess whether the three corporate entities (Archdiocese of Agana, Capuchins and FDMS) are so extensively controlled by the Holy See that a relationship of principal and agent is created. *See* Pl.'s Opp'n at 16, ECF No. 64. The court declines the Plaintiff's urging to apply the five factors, because that specific provision of the FSIA is not applicable here. By its very terms, Section 1610(g) applies in "certain actions" that involve a judgment arising out of the terrorism exception of Section 1605A. The court will instead apply *Doe's* analysis to determine whether the FAC sufficiently alleges the Holy See's day-to-day routine involvement in the affairs of the corporate entities. The FAC's allegations are nearly identical to those rejected by the Ninth Circuit in *Doe*. While the FAC alleges the Holy See exercises some control over these other corporate entities, such allegations simply do not meet the high level required to show day-to-day routine involvement of the Holy See in the affairs of said entities. *See Robles v. Holy See*, 20-CV-2106 (VEC), 2021 WL 5999337, at *5 (S.D.N.Y. Dec. 20, 2021) (relying on *Doe* analysis, court found *Bancec* presumption not overcome where "no allegations that the Holy See ignored separate

---

[22] This statute states in its entirety:

(g)    Property in Certain Actions. –

(1)  In general. – Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of –

    (A) the level of economic control over the property by the government of the foreign state;

    (B)  whether the profits of the property go to that government;

    (C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

    (D)  whether that government is the sole beneficiary in interest of the property; or

    (E)  whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

28 U.S.C. § 1610(g)(1).

1    status or ordinary corporate formalities" or required the separate entities "to obtain approvals for

2    routine business decisions; "the control must be to the domestic corporation as a whole, not to

3    isolated aspects of the corporation's operations"). As in *Doe*, the Plaintiff has not met his burden

4    to overcome the *Bancec* presumption of separate juridical statuses.

5            Applying the second equitable prong of *Bancec*, the Plaintiff also argues that treating the

6    corporate defendants and the Holy See as separate legal entities for jurisdictional purposes would

7    work an injustice in this case. *See* Pl.'s Opp'n at 18-21, ECF No. 64. The Plaintiff asserts that

8    "applying the presumption of separateness will continue to shield the Holy See from its obligations,

9    while allowing it to continue to enjoy the broad freedoms afforded to it in the United States." The

10   Plaintiff references the FAC's allegations that the 1985 Report that recognized the problem of clergy

11   sexual abuse and expressed concern litigation would ensue against the perpetrator and "those sought

12   to be held legally responsible with the wrongdoer." FAC at ¶16.d, ECF No. 1-1. The Plaintiff

13   asserts that the Holy See "has used the separate legal corporate form of the [Archdiocese of Agana,

14   Capuchins and FDMS] to avoid liability, while enjoying the wide array of legal benefits available

15   to religious institutions in the United States." *See* Pl.'s Opp'n at 20-21, ECF No. 64.

16           The court is unconvinced by the Plaintiff's arguments. In *Doe*, the Ninth Circuit reversed

17   the district court's finding that the plaintiff had shown the second equitable prong was met by the

18   complaint's allegations of wrongful acts perpetrated directly by the Holy See. *Doe*, 557 F.3d at

19   1080. The court reasoned that "[t]he existence of such *direct* wrongful acts cannot determine

20   whether the distinct wrongful acts of the affiliated *corporations* should also be attributed to the Holy

21   See." *Id.* (emphasis in original). The Ninth Circuit found that the plaintiff had not alleged that the

22   Holy See "inappropriately used the separate status of the corporations to its own benefit, as in

23   *Bancec*, or that the Holy See created the corporations for the purpose of evading liability for its own

24   wrongs." *Id.*

25           Here, the FAC does not contain any factual allegation showing fraud or abuse of the

26   corporate form by the Holy See. The Holy See did not dissolve the other corporate entities and take

27   control of their assets to avoid creditors or escape liability. There is no allegation that these separate

28   corporate entities were created as a sham for the purposes of conferring them with sovereign

1  immunity. The FAC's allegations regarding the 1985 Report never alleged an abuse of the corporate

2  form by the Holy See to evade liability for its own wrongs or for its own benefit. The Plaintiff has

3  not overcome *Bancec's* presumption of separate juridical statuses, and thus, the claims against the

4  Holy See for negligence, negligent supervision, and negligent hiring and retention with respect to

5  the acts and omissions of the Archdiocese of Agana, the Capuchins and FDMS are dismissed with

6  prejudice.

7       This does not end the court's inquiry because the Plaintiff has raised other causes of action

8  that do not stem from the tortious acts allegedly committed by the Archdiocese of Agana, the

9  Capuchins and FDMS. The second cause of action alleges *respondeat superior* liability against the

10 Holy See for Apuron's actions as an alleged employee of the Holy See. Additionally, Plaintiff made

11 other allegations in the third through fifth causes of action based on the Holy See's actions itself,

12 specifically its failure to warn of Apuron's dangerousness and its negligent supervision, hiring and

13 retention of Apuron. The court will next determine whether these causes of action fall under the

14 FSIA's tortious act exception.

15                          3.  Whether the FSIA tort exception applies

16      The Plaintiff asserts that the FSIA tortious activity exception applies here. Pl.'s Opp'n at 11,

17 ECF No. 64. In relevant part, under Section 1605(a)(5), a foreign state is not immune for acts "in

18 which money damages are sought . . . for personal injury . . . occurring in the United States and

19 caused by the *tortious act or omission* of the *foreign state or* of any official *or employee of that*

20 *foreign state* while *acting within the scope of his office or employment*[.]" 28 U.S.C. § 1605(a)(5)

21 (emphasis added). This tort exception, however, does not apply to two important categories of

22 claims:

23        (A) any claim based upon the exercise or performance or the failure to exercise or
          perform a *discretionary function* regardless of whether the discretion be abused, or
24        (B) any claim arising out of malicious prosecution, abuse of process, libel, slander,
          misrepresentation, deceit, or interference with contract rights[.]
25

26 28 U.S.C. § 1605(a)(5)(A) and (B) (emphasis added).

27                     a.  Whether acts of "agents" are included in exception

28      As noted above, the plain text of the tortious act exception extends only to tortious conduct

1   "by the foreign state" or its "official or employee." 28 U.S.C. § 1605(a)(5). Nevertheless, the

2   Plaintiff asserts that tortious conduct by Apuron acting as an *agent* of the Holy See would fall under

3   the Section 1605(a)(5) exception. *See* Pl.'s Opp'n at 22-25, ECF No. 64. The court rejects this

4   assertion just as the Southern District of New York did with a similar argument raised in *Robles*,

5   2021 WL 5999337, at *6.

6          In *Robles*, the court reasoned that the FSIA already includes the actions of "an agent" of a

7   foreign state as the basis for jurisdiction over the foreign state, so the court "must presume that

8   Congress intentionally omitted 'agent' from the section of the statute that establishes the [t]ortious

9   [a]ct [e]xception." *Id.* Support for this conclusion can be found when Section 1605(a)(5) is

10  compared to Section 1605A(a)(1) – the terrorism exception to jurisdictional immunity. Section

11  1605A(a)(1), provides, in relevant part, that a "foreign state shall not be immune. . . in any case . .

12  . in which money damages are sought against a foreign state for personal injury or death that was

13  caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision

14  of material support or resources for such an act if such act or provision of material support or

15  resources *is engaged in by* an official, employee, or *agent of such foreign state while acting within*

16  *the scope of* his or her office, employment, or *agency*." 28 U.S.C. § 1605A(a)(1) (emphasis added).

17  The terms "agent" and "agency" appear in this terrorism exception but not in the tortious act

18  exception set forth in Section 1605(a)(5). Thus, it is reasonable to conclude that Congress

19  intentionally excluded the tortious act of "agents" from the scope of the tortious act exception.

20  Accordingly, the court dismisses with prejudice all of Plaintiff's claims against the Holy See for

21  negligence, negligent supervision, and negligent retention that are predicated on the acts of omissions

22  of "agents" of the Holy See.

23                          b.   Acts by an employee of the Holy See

24         In the FAC, the Plaintiff alleges that Apuron was an employee of the Holy See, who was

25  appointed by and later removed by the Pope. *See* FAC at ¶¶5, 52, 57 and 65, ECF No. 1-1.

26  Additionally, the Plaintiff asserts that "Apuron was an employee of the Holy See through the alter

27  ego entities." *Id.* at ¶55. The FAC also asserts that the Holy See "dictates and safeguards the morals

28  and standards of conduct of the cardinals, bishops, and clergy of the Catholic Church[;]" that the

1  Holy see "controls the appointment, assignment and re-assignment of bishops[;]" and that all

2  "bishops, clergy, and priests, including the religious order priests, vow to show respect and

3  obedience to the Pope and the Holy See." *Id.* at ¶6. According to the FAC, the Holy See "requires

4  bishops to file a report, on a regular basis, outlining the status of, and any problems with, clergy,"

5  and "promulgates and enforces the laws and regulations regarding the education, training and

6  standards of conduct and discipline of its members and those who serve in the governmental,

7  administrative, judicial, educational and pastoral workings of the Catholic church world-wide." *Id.*

8  Based on these allegations at this stage of the proceeding, the court finds that the Plaintiff has

9  sufficiently pled factual allegations from which the court can infer that Apuron was an employee of

10  the Holy See during the alleged sexual assault of the Plaintiff.

11                               c.  Whether Apuron was acting within the scope of employment

12         The next issue is whether the tortious acts committed by Apuron were within the scope of

13  his employment with the Holy See. The parties agree that Guam law applies to this determination,

14  and that Guam courts apply California law because Guam's statute on a principal's responsibility

15  for negligence of an agent, *see* 18 GUAM CODE ANN. § 20309, was derived from California Civil

16  Code §2338. *See* Holy See's Mem. P. & A. Supp. Mot. Dismiss at 16, ECF No. 52, and Pl.'s Opp'n

17  at 21, ECF No. 64.

18         As noted by the Holy See,

19         "California has established a two-prong test to determine whether an employee is
           acting within the scope of employment." *Liu v. Republic of China*, 892 F.2d 1419,
20         1427 (9th Cir. 1989). California courts examine whether "1) the act performed was
           either required or incident to his duties, or  2) the employee's misconduct could be
21         reasonably foreseen by the employer in any event." *Alma W. v. Oakland Unified Sch.
           Dist.*, 123 Cal. App. 3d 133, 139 (1981). Under well-established California law, a
22         master is not vicariously liable if the "servant is pursuing his own ends." *Clough v.
           Allen*, 115 Cal. App. 330, 332 (1931).
23

24  Holy See's Mem. P. & A. Supp. Mot. Dismiss at 16, ECF No. 52

25         Based on the cases cited in the Holy See's motion, California courts have consistently held

26  that sexual abuse falls outside the scope of employment with respect to clerics and other employees.

27  *Id.* at 17-19. The Holy See's motion references cases that reach the same conclusion under the FSIA

28  tort exception analysis. *Id.* at 18. The Holy See further notes that the FAC's own allegations

1   repeatedly assert that Apuron's alleged abuse occurred at Apuron's personal residence on the

2   weekend, further supporting the Holy See's contention that such acts were outside the scope of any

3   employment Apuron had with the Holy See as a matter of law.

4          Despite the cases cited by the Holy See, the Plaintiff maintains that Apuron's conduct fell

5   within the scope of his employment.  Specifically, the Plaintiff analogizes this case to *Lu v. Powell*,

6   621 F.3d 944 (9th Cir. 2010).  In *Lu*, the plaintiffs were citizens of the People's Republic of China

7   who filed for asylum on political grounds.  *Id.* at 946.  They were interviewed by Powell, an asylum

8   officer with Immigration and Naturalization Service, who later telephoned each of plaintiffs asking

9   for a separate meeting with them in their respective residences.  *Id.* During said meetings, Powell

10  insinuated that he would approve the asylum applications if payment was made to him and then

11  proceeded to make sexual advances on the plaintiffs, attempting to unzip and remove the pants of

12  one plaintiff and offensively touching the private parts of the other plaintiff.  *Id.*  The plaintiffs

13  brought suit against Powell, his supervisor and the United States.  *Id.* at 947.  The Central District

14  of California dismissed the claims against the United States and various officials for failure to state

15  a cause of action under the Federal Torts Claims Act ("FTCA") because Powell was not acting

16  within the scope of his employment as an asylum officer during his interactions with the plaintiffs.

17  *Id.* at 948.  On appeal, the Ninth Circuit reversed, stating that

18          Powell was part of a process in which he was expected to participate in a lawful way,
            reviewing the documentation of the asylum applicant, interviewing her, and assessing
19          the credibility of her claims. . . . Powell abused his powers for his own benefit.  In
            doing so, he acted within the scope of his employment as defined by California.  To
20          compensate his victims, spread the loss, and stimulate the government to greater
            vigilance in controlling aberrant behavior, California law makes the United States
21          bear the cost of Powell's conduct, unauthorized but incidental to the asylum system.

22  *Lu*, 621 F.3d at 949.

23         The Plaintiff contends that similar to *Lu*, this case involves a person in a position of authority,

24  abusing that authority conferred upon him by his employer to harm another person encountered

25  through their work.  Here, the Plaintiff's parents placed a great deal of trust and faith in the Church.

26  The Plaintiff contends that he would have gone home during the weekends but for Apuron's

27  arrangement to have the Plaintiff stay in his home.  Apuron allegedly used his position as Archbishop

28  to exercise authority and control over the Plaintiff in order to abuse him.  The Plaintiff argues that

1    this wielding of religious power and physical force was even stronger than the abuse of power

2    Powell exerted over the plaintiffs in *Lu.*

3            The Holy See counters that (1) the court is bound by the decisions of the California courts

4    that have consistently held that sexual abuse falls outside the scope of a priest's employment;

5    (2) there was no rape in *Lu* and the abuse of power there was the asylum officer's unlawful sexual

6    touching while soliciting a bribe to grant approval of their asylum applications; and (3) the California

7    Court of Appeal expressly disapproved *Lu* in *Z.V. v. County of Riverside*, 238 Cal. App. 4th 889

8    (2015), where it held that a social worker's sexual abuse of a minor in foster care fell outside the

9    scope of employment.  That California Court of Appeal concluded that the Ninth Circuit's *Lu*

10   decision "is not accurate either as a statement of California law or as an application of it." *Id.* at 902.

11           The court declines to adopt the Plaintiff's interpretation of California law.  The Plaintiff's

12   expansive approach to the *respondeat superior* theory goes against Congress's intent in enacting the

13   FSIA to "codify the restrictive theory of sovereign immunity." *Samantar v. Yousuf*, 560 U.S. 305,

14   313 (2010); *Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*, 899 F.3d 1081, 1090 (9th Cir.

15   2018) ("FSIA 'codifies, as a matter of federal law, the restrictive theory of sovereign immunity.'").

16   The Holy See's analysis of California case law on this matter is accurate,[23] and the Plaintiff has not

17   _____

18           [23]   *See Daza v. Los Angeles Cmty. Coll. Dist.*, 247 Cal. App. 4th 260, 269 (2016) (alleged
     sexual assault of adult student by guidance counselor "fell outside his scope of employment"); *Z.V.*
19   *v. County of Riverside,* 238 Cal. App. 4th 889 (2015) (social worker's sexual assault of foster care
     child outside of work hours and at social worker's apartment not within scope of employment);
20   *Richelle L. v. Roman Cath. Archbishop*, 106 Cal. App. 4th 257, 283 n.15 (2003), as modified (Mar.
     17, 2003) ("alleged sexual misconduct violated the vow of celibacy compelled by the Roman
21   Catholic Church, and therefore was not within the scope of his employment"); John Y. v. Chaparral
     Treatment Center, Inc. 101 Cal. App. 4th 565 (2002) (counselor's sexual molestation of minor living
22   in residential facility not within scope of employment);  *Maria D. v. Westec Residential Sec., Inc.*,
     85 Cal. App. 4th 125, 128 (2000), as modified (Dec. 20, 2000) (employer not liable as a matter of
23   law under *respondeat superior* doctrine for security guard's sexual assault of woman because "the
     causal nexus between the sexual assault and the security guard's employment was too attenuated for
24   a trier of fact to conclude that the misconduct was within the scope of his employment"); *Mark K.*
     *v. Roman Catholic Archbishop*, 67 Cal. App. 4th 603, 609 (1998), as modified on denial of reh'g
25   (Oct. 28, 1998) (the doctrine of respondeat superior is not available as to minor's allegations of
     sexual abuse since "abuse is committed outside the scope of the cleric's employment");  *Lisa M. v.*
26   *Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 301 (1995) (declining to hold hospital liable
     under *respondeat superior* theory for technician who sexually molested patient during ultrasound

27

28

1   cited any contrary ruling by a California court holding that sexual abuse by a member of the clergy

2   falls within the scope of such employment. The court finds that the Plaintiff has failed to satisfy his

3   burden of production to show that the requirements of the tortious act exception applies to Apuron's

4   alleged sexual abuse of the Plaintiff because any such misconduct fell outside the scope of Apuron's

5   employment with the Holy See. Accordingly, any *respondeat superior* claims arising from Apuron's

6   alleged sexual abuse are dismissed as against the Holy See.

7       The Plaintiff also raises an alternate theory to *respondeat superior* and asserts that "an

8   employer may be liable for an employee's act where the employer either authorized the tortious act

9   or subsequently ratified an originally unauthorized tort." Pl.'s Opp'n at 27, ECF No. 64 (quoting

10  *S.G. v. San Francisco United Sch. Dist.,* No. 17-CV-05678-EMC, 2018 WL 1876875, at *4 (N.D.

11  Cal. Apr. 19, 2018)). The Plaintiff asserts that the Holy See knew or reasonably should have known

12  of the widespread abuse of children based on the 1985 Report and numerous other state grand jury

13  investigations, and the Holy See should have, at a minimum, investigated the clergy abuse. Pl.'s

14  Opp'n at 28, ECF No. 64. The Plaintiff argues that the Holy See's inaction ratified Apuron's sexual

15  abuse. *Id.*

16      The court declines to adopt this alternate theory because the plain language of FSIA's tort

17  exception precludes ratification as a basis for jurisdiction. Congress could have included it in the

18  tort exception, but it did not. As the Holy See points out, "[r]atification is an agency theory of

19  liability." Holy See's Mem. P. & A. Supp. Mot. Dismiss at 20, ECF No. 52 (citing 18 Guam Code

20  Ann. § 20204 and RESTATEMENT (SECOND) OF AGENCY § 82 (1958)). As the court discussed above

21

22  examination since "technician simply took advantage of solitude with a naive patient to commit an
    assault for reasons unrelated to his work."); *John R. v. Oakland Unified Sch. Dist.*, 48 Cal. 3d 438,
23  452 (1989) (school district not vicariously liable under the doctrine of *respondeat superior* for
24  teacher alleged to have sexually molested a minor while at the teacher's apartment participating in
    an officially sanctioned extracurricular program because "the connection between the authority
25  conferred on teachers to carry out their instructional duties and the abuse of that authority to indulge
    in personal, sexual misconduct is simply too attenuated to deem a sexual assault as falling within the
26  range of risks allocable to a teacher's employer"); *Jeffrey E. v. Cent. Baptist Church*, 197 Cal. App.
27  3d 718, 723 (1988) (church not liable under doctrine of respondeat superior for child who was
    repeatedly molested by Sunday school teacher whose conduct was "neither required, incidental to
28  his duties, nor foreseeable. They were, therefore, not within the scope of his employment.").

1   in Section III.B.3.a., Congress excluded the acts of "agent" from the scope of the tortious act

2   exception.  Even assuming that ratification could form the basis for jurisdiction under the tort

3   exception, such theory would fail under the discretionary function exclusion as discussed more fully

4   *infra* at Section III.B.4.

5                    d.    Allegations of tortious conduct by the Holy See outside of the United States

6           With respect to the direct claims against the Holy See, including Plaintiff's claims for

7   negligence, negligent supervision, negligent hiring and retention, the Plaintiff must show that the

8   entirety of said torts occurred within the United States as required by Section 1605(a)(5).  Here, the

9   FAC includes allegations against the Holy See such as promulgating policies and supervising its

10  employees, but such conduct occurred largely in the Vatican, not the United States.  *See O'Bryan*

11  *v. Holy See*, 556 F.3d 361, 385 (6th Cir. 2009) ("the tortious act exception to the FSIA's grant of

12  immunity would not include any theory of liability premised on the Holy See's own negligent

13  supervision because such acts presumably occurred abroad; moreover, a direct claim leveled against

14  the Holy See for promulgating . . . [policy] would not fall within the tortious act exception because

15  it too presumably occurred abroad."); *English v. Thorne*, 676 F. Supp. 761, 764 (S.D. Miss. 1987)

16  (in action alleging tortious conduct by Catholic priest that sought to impose liability upon the

17  Vatican based on allegations of negligent employment, retention and reassignment in addition to a

18  breach of fiduciary duty owed to plaintiffs, court held that"any of the alleged acts or omissions by

19  the Vatican would not have occurred within the jurisdiction of the United States, but rather within

20  the confines of the Vatican"); *Robles*. 2021 WL 5999337, at *11 (finding Holy See immune from

21  claims arising from Holy See's conduct that occurred outside the United States).

22          The Plaintiff contends that while the Holy See is based in the Vatican, its authority,

23  jurisdiction and sovereignty are vested in the Pope and his advisors "all of whom travel globally to

24  achieve the purposes of the Holy See."  Pl.'s Opp'n at 14, ECF No. 64.  Plaintiff also notes that the

25  FAC alleges that the Holy See's reach is world-wide, that the Holy See's inactions in Guam to

26  intervene in the alleged abuse led to the Plaintiff's injuries, and that the injuries were sustained by

27  Plaintiff in Guam.  The Plaintiff's arguments are unconvincing.  Consistent with the cases cited

28  above, the Plaintiff's negligence, negligent supervision, and negligent hiring and retention claims

1    that arise from any conduct that occurred outside the United States are dismissed with prejudice.

2                    4.    Whether the discretionary function exclusion applies

3            FSIA's "discretionary function exclusion shields foreign sovereign from tort claims 'based

4    upon the exercise or performance or the failure to exercise or perform a discretionary function

5    regardless of whether the discretion be abused.'" *Doe*, 557 F.3d at 1083 (quoting 28 U.S.C.

6    §1605(a)(5)(A)).  This language closely parallels language in the FTCA, so courts look to case law

7    interpreting the FTCA when analyzing the FSIA's discretionary function exclusion.  *Id.*  There is a

8    two-part test to determine whether this exclusion applies: (1) whether the act is "discretionary in

9    nature" or involves "an element of judgment or choice" and (2) whether the conduct is of the nature

10   that the exclusion "was designed to shield."  *Id.* at 1083-84 (quoting *United States v. Gaubert*, 499

11   U.S. 315, 322 (1991) (internal quotation marks and citation omitted).  The Ninth Circuit later

12   clarified that judgments "of the kind that the discretionary function exception was designed to

13   shield" are "governmental actions and decisions based on considerations of public policy."  *Soldano*

14   *v. United States*, 453 F.3d 1140, 1145 (9th Cir. 2006) (internal quotation marks and citations

15   omitted).

16           While the burden of proving the *Gaubert* factors ultimately falls on the foreign state asserting

17   the discretionary function exception, "a plaintiff must advance a claim that is facially outside the

18   discretionary function exception in order to survive a motion to dismiss."  *Prescott v. United States*,

19   973 F.2d 696, 702 & n. 4 (9th Cir. 1992) (citing *Carlyle v. U.S. Dep't of the Army*, 674 F.2d 554,

20   556 (6th Cir.1982).

21           Here, the FAC fails to allege the existence of a policy that is specific and mandatory on how

22   the Holy See must supervise, investigate or remove abusive members of the clergy.  The Plaintiff's

23   opposition brief cites to the Code of Canon Law and contends that Canon Law mandates punishment

24   for misconduct against a minor.  The FAC, however, contains no such allegation.  Additionally, the

25   FAC fails to allege that the Holy See's decisions to retain Apuron and not warn about his

26   propensities "involved no element of judgment, choice, or discretion."  *Doe*, 557 F.3d at 1084.  The

27   FAC simply has not pled any actions that fall facially outside the discretionary function exclusion.

28   Thus, the first *Gaubert* factor is satisfied because the FAC fails to allege any actions that fall facially

1  outside the of the discretionary function exception.

2       The court next analyzes the second *Gaubert* prong of the discretionary function exclusion.

3  In dismissing the plaintiff's negligent retention, supervision and failure to warn claims in *Doe,* the

4  Ninth Circuit stated the following as to the second *Gaubert* factor:

5       the decision of whether and how to retain and supervise an employee, as well as
        whether to warn about his dangerous proclivities, are the type of discretionary
6       judgments that the exclusion was designed to protect.  We have held the hiring,
        supervision, and training of employees to be discretionary acts.  Moreover, failure to
7       warn about an individual's dangerousness is discretionary.

8  *Doe*, 557 F.3d 1084 (internal citations omitted).

9       Even assuming that the Holy See knew about Apuron's alleged abuse of the Plaintiff or other

10  minors, the Holy See nonetheless may have decided to retain him and remain silent about the abuses

11  because "it felt that to do otherwise would have harmed the Church's reputation locally, or because

12  it felt that pastoral stability was sufficiently important for the parishioners' well-being, or because

13  low ordination rates or staffing shortages made it necessary to keep [Apuron] on." *Id.* At 1085.

14  Based on the Ninth Circuit's reasoning in *Doe,* the court finds that the second *Gaubert* prong has

15  been satisfied.  Accordingly, the court dismisses the Plaintiff's negligence, negligent supervision,

16  and negligent hiring and retention causes of action because said claims are barred by FSIA's

17  discretionary function exclusion.

18            5.  Whether the misrepresentation exclusion applies

19       The Holy See next argues that the misrepresentation exclusion bars the Plaintiff's claims.

20  FSIA's tortious act exception also excludes "any claim arising out of . . . misrepresentation [or]

21  deceit." 28 U.S.C. §1605(a)(5)(B).  "Like the discretionary function exclusion, the misrepresentation

22  exclusion in the FSIA . . ., has been interpreted in light of the misrepresentation exclusion in the

23  FTCA[.]  The misrepresentation exclusion covers both acts of affirmative misrepresentation and

24  failure to warn." *Doe*, 557 F.3d at 1085, n.10 (internal citation omitted).

25       To determine whether a claim is barred by the misrepresentation exclusion, courts look to

26  the "gravamen" of the claim, regardless of the labels used or a plaintiff's characterization of the

27  cause of action. *Snow-Erlin v. U.S.*, 470 F.3d 804, 808 (9th Cir. 2006).  "[T]he essence of an action

28  for misrepresentation, whether negligent or intentional, is the communication of misinformation on

1    which the recipient relies." *Block v. Neal*, 460 U.S. 289, 296 (1983).

2            The Holy See asserts that the essence of the Plaintiff's claims is that the Holy See knew about

3    Apuron's abuse, concealed it and failed to communicate information regarding Apuron's action to

4    warn others.    The Holy See notes that the FAC contains numerous allegations that the Holy See

5    failed "to inform," failed to "provide adequate warning" and failed "to report" abuses committed by

6    Apuron and others and instead "covered them up."  FAC at ¶¶ 48(d), 66, 72-73, 77(b) and (d), 96(e),

7    97(c), 98(e) and 105-106, ECF No. 1-1.

8            The Plaintiff counters that the misrepresentation exclusion does not apply to grant immunity

9    to the Holy See since the crux of the FAC's claims are not based on any reliance by the Plaintiff on

10   the Holy See or other Defendants' misrepresentations.   Instead, the Plaintiff asserts that "the

11   gravamen of [his] claims rest on child sexual abuse, and Defendants' failure to identify abuses,

12   punish them, and prevent future abuse once they were put on notice of the abuse[.]"  Pl.'s Opp'n

13   at 32, ECF No. 64.

14           The Plaintiff relies on the reasoning of the *Block* case to assert that the misrepresentation

15   exclusion does not apply to his claims.   In *Block*, the plaintiff obtained a loan from the Farmer's

16   Home Administration ("FmHA") to construct a prefabricated home.  460 U.S. at 291.  The plaintiff's

17   contract with the builder required the work to conform to plans approved by FmHA, and an FmHA

18   official inspected the site soon after construction began, before it was concluded, and after the house

19   was completed.  *Id.* at 291-92.   The FmHA official's final report indicated that "the construction

20   accorded with the drawings and specifications approved by FmHA." *Id.* at 292.   After the plaintiff

21   moved into the home, she discovered the heat pump was not working properly, and a subsequent

22   inspection by other FmHA officials identified a number of other defects.  *Id.*  The plaintiff brought

23   suit against the FmHA when it declined to pay for correction of the defects.  *Id.*  The issue before

24   the Supreme Court was whether the plaintiff's claim for misrepresentation fell within the FTCA's

25   exception under 28 U.S.C. § 2680(h) as argued by the Government.  *Id.* at 294.  The Supreme Court

26   stated that Section 2680(h) "relieves the Government of tort liability for pecuniary injuries which

27   are wholly attributable to reliance on the Government's negligent misstatements." *Id.* at 297.   The

28   court found that "the Government's misstatements were not essential to the plaintiff's negligence

claim." *Id.* The court stated that "FmHA's duty to use due care to ensure that the builder adhere to previously approved plans and cure all defects before completing construction is distinct from any duty to use due care in communicating information" to the plaintiff. *Id.*

The Plaintiff analogizes his case to *Block* and asserts that "the claims in this case are not based on the Holy See's failure to obtain and share information." Pl.'s Opp'n at 33. The Plaintiff asserts his claims are instead "based on the initial sexual abuse he endured by then-Archbishop Apuron, *as well as* the continued abuse he endured by then-Archbishop Apuron as a result of the Defendants' and Holy See's negligence and the multiple ways the Holy See could have acted to stop the abuse." *Id.* at 34 (emphasis in original).

Having examined the FAC's allegations, the court finds that the gravamen of the claims against the Holy See is based on its purported concealment of abuse perpetrated by members of the clergy, including Apuron, and its alleged failure to warn the Plaintiff and others of said conduct. As such, these claims are barred by the misrepresentation exclusion of the tortious act exception of the FSIA. Additionally, even if the crux of the Plaintiff's claims against the Holy See are based on other actions such as the failure to investigate, supervise and remove Apuron, the court has already determined that said claims are barred by the discretionary function exclusion.

6. Whether to strike Plaintiff's jury trial demand and punitive damages requests

The Holy See also moves that the Plaintiff's request for a jury trial and punitive damages be stricken. Foreign states have the right to a non-jury trial if they so elect. Under federal law, "district courts shall have original jurisdiction . . . of any *nonjury civil action against a foreign state* . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a) (emphasis added). Additionally, pursuant to Section 1441(d), "[a]ny civil action brought in a State court against a foreign state . . . may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. *Upon removal the action shall be tried by the court without jury.*" 28 U.S.C. § 1441(d) (emphasis added); *see* H.R. Rep., at 33 ("[O]ne effect of removing an action under the new section 1441(d) will be to extinguish a demand for a jury trial made in the state court"); S. Rep. No.

1   94–1310, p. 32 (1976) (same). A waiver of immunity is not a waiver of immunity from trial by jury.

2   *See Aboeid v. Saudi Arabian Airlines, Inc.*, No. CV-10-2518 (SJ) (VVP), 2011 WL 2222140, at \*3

3   (E.D.N.Y. June 1, 2011). The law on this issue is clear. "No right to a jury trial attaches to claims

4   brought against a foreign state." *Wilmington Trust v. U.S. Dist. Ct. for Dist. of Hawaii*, 934 F.2d

5   1026, 1032 (9th Cir. 1991). Accordingly, the court dismisses the demand for a jury trial as to the

6   Holy See.

7          As to the request to dismiss the Plaintiff's request for punitive damages as against the Holy

8   See, the Plaintiff's Opposition does not contest this request. *See* Pl.'s Opp'n at 35, n.18, ECF No.

9   64. Under Section 1606, foreign states themselves are not liable for punitive damages. Accordingly,

10  the court grants the Holy See's request and dismisses the Plaintiff's request for punitive damages

11  against the Holy See.

12  **IV.     CONCLUSION**

13         Based on the above discussion, the court GRANTS the Holy See's Motion to Dismiss for

14  insufficient service of process and for lack of subject matter jurisdiction and personal jurisdiction

15  under the FSIA.[24] The court orders that the Plaintiff's claims against the Holy See be dismissed with

16  prejudice.

17         IT IS SO ORDERED.

18                                                                  /s/ Frances M. Tydingco-Gatewood
                                                                       **Chief Judge**
19                                                                  **Dated: Feb 23, 2023**

20

21

22

23

24

25

26  _____

27         [24] Because the court has dismissed the Plaintiff's claims against the Holy See based on
    jurisdictional grounds, the Holy See's argument that the FAC fails to state a claim against it is
28  deemed moot.